# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **THOMAS G. HUFFMAN, JR.,** ) | |
| Plaintiff ) | |
| ) | Civil Action No. 2:18cv00015 |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| **ANDREW SAUL,**[1] ) | |
| **Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Thomas G. Huffman, Jr., ("Huffman"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Huffman protectively filed his application for DIB on April 14, 2014, alleging disability as of February 26, 2014, based on degenerative disc disease; a herniated disc; arthritis in his knees and back; residuals from bilateral knee surgery; anxiety; depression; and insomnia. (Record, ("R."), at 12, 195-96, 215, 240.) The claim was denied initially and upon reconsideration. (R. at 95-97, 100-03.) Huffman then requested a hearing before an administrative law judge, ("ALJ"). (R. at 108-09.) The ALJ held a hearing on March 9, 2017, at which Huffman was represented by counsel. (R. at 38-75.)

By decision dated May 10, 2017, the ALJ denied Huffman's claim. (R. at 12-29.) The ALJ found that Huffman met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2019. (R. at 14.) The ALJ found that Huffman had not engaged in substantial gainful activity since February 26, 2014, the alleged onset date.[2] (R. at 14.) The ALJ found that the medical evidence established that Huffman had severe impairments, namely degenerative disc disease, status-post surgery; degenerative joint disease of the bilateral knees, status-post arthroscopies; and obesity, but he found that Huffman did not have an impairment or combination of impairments that met or medically

---

[2] Therefore, Huffman must show that he was disabled between February 26, 2014, the alleged onset date, and May 10, 2017, the date of the ALJ's decision, in order to be eligible for benefits.

equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14, 16.) The ALJ found that Huffman had the residual functional capacity to perform light[3] work that required no more than occasional stooping, crawling, crouching, kneeling and climbing of ramps and stairs and that did not require him to climb ladders, ropes or scaffolds or to work around vibration. (R. at 17.) The ALJ found that Huffman was capable of performing his past relevant work as an employment specialist. (R. at 27.) In addition, based on Huffman's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Huffman could perform, including jobs as a cashier, a marker and an inspector/grader. (R. at 27-28.) Thus, the ALJ concluded that Huffman was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 29.) *See* 20 C.F.R. § 404.1520(f), (g) (2019).

After the ALJ issued his decision, Huffman pursued his administrative appeals, (R. at 188, 301-03), but the Appeals Council denied his request for review. (R. at 1-5.) Huffman then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Huffman's motion for summary judgment filed January 21, 2019, and the Commissioner's motion for summary judgment filed February 5, 2019.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

## II. Facts[4]

Huffman was born in 1972, (R. at 44, 195), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and specialized training in security office training. (R. at 216.) Huffman has past work experience as a direct support specialist, identified as an employment specialist[5] under the Dictionary of Occupational Titles, ("DOT"). (R. at 44, 69.) Huffman stated that he was unable to perform his job duties due to back and leg pain. (R. at 46.) He stated that he had back surgery in February 2014, and he had not attempted to return to work since that time. (R. at 48-49.) Huffman stated that the surgery did not improve his back problems. (R. at 49-50.) He stated that, since February 2014, he had suffered from bilateral knee pain and low back pain. (R. at 49-50.) Huffman stated that, at times, he would fall due to his legs giving away. (R. at 49.) Huffman stated that his neurosurgeon had recommended additional back surgery, but he elected against it because his primary care physician, Dr. Renfro, advised him not to undergo the surgery. (R. at 51-52.) He stated that, since taking Lyrica, he was able to "function a little bit better," but he experienced side effects, such as drowsiness and difficulty concentrating. (R. at 54-55.) Huffman testified that he had been prescribed a transcutaneous electrical nerve stimulation, ("TENS"), unit, which "helps a little." (R. at 52-53.)

---

[4] Huffman's only dispute is with respect to the ALJ's assessment of his physical limitations. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Therefore, the court will address the facts relevant to Huffman's physical health.

[5] The vocational expert classified this job as light, skilled work. (R. at 69.) However, he stated that it would be classified at the "very heavy" exertional level as performed by Huffman. (R. at 69.)

Robert Jackson, a vocational expert, also was present and testified at Huffman's hearing. (R. at 68-74.) Jackson was asked to consider a hypothetical individual of Huffman's age, education and work history, who had the residual functional capacity to perform light work; who could frequently crawl, crouch, kneel and climb ramps and stairs; and who could occasionally stoop and climb ladders, ropes and scaffolds. (R. at 69-70.) He stated that such an individual could perform Huffman's past work as typically performed, but not as actually performed. (R. at 70.) Jackson also stated that such an individual could perform other work that existed in significant numbers, such as a cashier, a marker and an inspector/grader. (R. at 70.) Jackson was asked to consider the same hypothetical individual, but who could occasionally stoop, crawl, crouch, kneel and climb ramps and stairs; who could never climb ladders, ropes or scaffolds; and who could not work around vibration. (R. at 70-71.) He stated that the individual could perform the previous jobs identified, including Huffman's past work. (R. at 70-71.) Jackson testified that the same individual, but who was limited to the performance of simple, routine tasks and who could not work with the general public, could not perform Huffman's past work, but could perform the jobs of a marker, an inspector/grader and a packer. (R. at 71.)

Jackson was then asked to consider a hypothetical individual who had the residual functional capacity to perform sedentary[6] work that allowed occasional lifting of items weighing up to 15 pounds; who could stand and/or walk up to two hours per day and no more than 30 minutes at a time; who could sit up to six hours

---

[6] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2019).

per day and no more than 30 minutes at a time; who could never climb, stoop, kneel, balance, crouch or crawl; who could not use his upper extremities for reaching, pushing or pulling; who could not work around heights or vibration; who would be absent from work at least two days per month; who would be limited to performing simple, routine tasks; and who would not be required to work with the general public. (R. at 71-72.) He stated that there would be no jobs available that such an individual could perform. (R. at 71.)

In rendering his decision, the ALJ reviewed medical records from Dr. Robert McGuffin, M.D., a state agency physician; Dr. Bert Spetzler, M.D., a state agency physician; Associated Neurologists of Kingsport; Johnson City Medical Center; East Tennessee Brain & Spine Center, P.C., ("Brain & Spine Center"); Mountainview Regional Medical Center; Bristol Regional Medical Center; and Dr. Thomas E. Renfro, M.D.

The medical evidence shows that Huffman had longstanding complaints of chronic and acute knee and low back pain. In May 2008, x-rays of Huffman's lumbar spine showed mild degenerative changes with disc disease at the L5-S1 level. (R. at 548.) A December 2008 lumbar MRI showed mixed central spondylolytic disc protrusions at the L4-5 and L5-S1 levels with annular tears and slight displacement of the L5 nerve root. (R. at 539.) In January 2010, Huffman presented to the emergency room after he twisted his left knee and felt it pop. (R. at 432-36.) X-rays showed no joint effusion and no fracture. (R. at 435.) In February 2010, Huffman presented to the emergency room for complaints of left knee pain resulting from a fall. (R. at 556-62.) X-rays of Huffman's left knee showed possible small joint effusion. (R. at 560.) In March 2010, Huffman underwent left knee arthroscopic anterior cruciate ligament, ("ACL"), tear

reconstruction. (R. at 564-65.) Post-operatively, Huffman completed a course of physical therapy, from which he was discharged in June 2010 after having made significant improvement. (R. at 476-538.)

Huffman continued to complain of chronic low back pain, and a May 2011 lumbar MRI showed disc space narrowing at L4-5 with mild symmetric protrusion of the disc and foraminal narrowing on both sides, as well as an annular tear with disc bulge at the L5-S1 level. (R. at 474.) Over the following months, Huffman followed up with Dr. Thomas E. Renfro, M.D., his primary care provider, for ongoing back and knee pain. (R. at 628-39, 646-52.) Huffman's physical examination remained normal, showing no joint swelling, normal movements of all extremities, intact sensation and reflexes and normal motor strength. (R. at 631, 634, 638, 648, 652.) Dr. Renfro treated Huffman's back pain conservatively with medication, and Huffman continued to work. (R. at 633, 635-36, 638, 646, 650, 652.) On August 6, 2012, x-rays of Huffman's right knee showed no fracture, deformity, bony erosion or destructive lesion. (R. at 468.) In October 2012, an MRI of Huffman's right knee revealed a probable ACL ganglion cyst and trace effusion with mild chondral changes. (R. at 570-71.) On November 9, 2012, Huffman's physical examination remained normal, showing no joint swelling, normal movements of all extremities, intact sensation and reflexes and normal motor strength. (R. at 627.) On December 13, 2012, Huffman underwent a right knee partial medial meniscectomy with chondroplasty of the patellar articular surface, medial femoral condyle and lateral tibial plateau with limited synovectomy of the medial plica and cystic structure. (R. at 736-37.)

On May 7, 2013, Huffman reported that his back pain had improved with medication and that, since having surgery, his right knee was "doing better." (R. at

353.) Huffman's physical examination was grossly normal, showing no joint swelling, normal movements of all extremities, intact sensation and normal motor strength. (R. at 353.)

On June 3, 2013, Dr. Otakar Kreal, M.D., a neurologist with Associated Neurologists of Kingsport, saw Huffman for his complaints of back pain. (R. at 305-07.) Huffman reported that his medication helped his low back pain and that he was doing "pretty well with the pain overall." (R. at 306.) Dr. Kreal reported that Huffman had no abnormal movements, and he had a normal gait. (R. at 306.) Dr. Kreal instructed Huffman to use Percocet as needed and did not plan to see him for one year. (R. at 305.)

On September 6, 2013, Huffman reported that his back pain had improved with medication and that his knees were "doing better." (R. at 348.) Huffman's physical examination was grossly normal, showing no joint swelling, normal movements of all extremities, intact sensation and normal motor strength. (R. at 348.) On December 23, 2013, Huffman reported increased back pain that radiated into his lower extremities, but he reported that his knee pain was "not as bad." (R. at 340-44.) He reported that he rarely had to use oxycodone. (R. at 341.) Huffman's physical examination was grossly normal, showing no joint swelling, normal movements of all extremities, intact sensation and normal motor strength. (R. at 343.)

On January 28, 2014, an MRI of Huffman's lumbar spine showed degenerative changes at L4-L5 and L5-S1 levels, resulting in central canal stenosis at the L4-5 and left S1 nerve root impingement. (R. at 572-76.) On February 12, 2014, Huffman was seen at Brain & Spine Center for complaints of low back pain

and left lower extremity pain. (R. at 321-24.) Huffman reported that Percocet improved his pain, but he could not take it while working. (R. at 321.) Upon examination, Huffman had no superficial tenderness to palpation and no significant pain on forward flexion or extension; his straight leg raising tests were positive on the left; he had decreased sensation posteriorly in the left calf; his patella and Achilles reflexes were two on the right; his patella reflex on the left was absent with an Achilles reflex of one on the left; he had a normal gait; his motor strength was 5/5 throughout both lower extremities with no deficits; and he could heel and toe walk without difficulty. (R. at 323.) Richard C. Maupin, PA-C, a certified physician assistant, diagnosed herniated nucleus pulposus at the left L5-S1 level, with left S1 radiculopathy and degenerative disc disease and lumbar spondylosis at the L4-L5 and L5-S1 levels. (R. at 324.) A lumbar discectomy was scheduled. (R. at 323.) Maupin indicated that Huffman could continue working until the day of surgery. (R. at 324.)

On February 26, 2014, Huffman underwent a left L5-S1 microdiscectomy with proximal foraminotomy over the left S1 nerve root. (R. at 328-32.) Huffman tolerated the procedure well, and during a follow-up appointment with Dr. Renfro in May 2014, reported that the back surgery had improved his sciatica, but not his back pain. (R. at 329, 338.) Huffman complained of back and knee pain. (R. at 335.) Huffman's physical examination was grossly normal, showing no joint swelling, normal movements of all extremities, intact sensation and normal motor strength. (R. at 337.) Huffman reported that, following back surgery, he attempted to return to work, but was unable to do so due to pain. (R. at 338.) In August 2014, Huffman continued to report low back pain and left leg weakness. (R. at 365.) His physical examination was grossly normal, showing no joint swelling, normal

movements of all extremities, intact sensation and normal motor strength. (R. at 367.)

On August 25, 2014, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, indicating that Huffman had the residual functional capacity to perform light work. (R. at 82-84.) He found that Huffman had an unlimited ability to balance; he could frequently climb ramps and stairs, kneel, crouch and crawl; and he could occasionally climb ladders, ropes and scaffolds and stoop. (R. at 82.) Dr. McGuffin opined that Huffman had no manipulative, visual, communicative or environmental limitations. (R. at 82-83.)

On November 4, 2014, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, indicating that Huffman had the residual functional capacity to perform light work. (R. at 91-92.) He found that Huffman had an unlimited ability to balance; he could frequently climb ramps and stairs, kneel, crouch and crawl; and he could occasionally climb ladders, ropes and scaffolds and stoop. (R. at 91-92.) Dr. Spetzler opined that Huffman had no manipulative, visual, communicative or environmental limitations. (R. at 92.)

In December 2014, Huffman reported to Dr. Renfro that he was experiencing more leg weakness, and his knees were aching more. (R. at 587-88.) Huffman's physical examination remained normal, showing no joint swelling, normal movements of all extremities, intact sensation and reflexes and normal motor strength. (R. at 590.) On January 5, 2015, upon return to his neurosurgeon's office, Huffman complained of increased back pain that radiated into his left lower extremity. (R. at 395.) On examination, inspection of the surgical incision showed no tenderness or signs of infection; and Huffman had good range of motion in his

lumbar spine. (R. at 397.) Huffman had a positive straight leg raise test on the left and negative on the right, but his motor strength was graded 5/5, with the exception of left knee flexion, which was 4/5; and he could heel and toe walk. (R. at 397). Maupin diagnosed lumbar radiculopathy and lumbago and ordered an updated MRI. (R. at 397.) On January 26, 2015, an MRI of Huffman's lumbar spine showed no evidence of recurrent disc herniation or stenosis at the L5-S1 level; and a grade 1 spondylolisthesis with a disc protrusion at the L4-L5 level, greater on the right, causing some left lateral recess stenosis. (R. at 381-82, 394.) On January 28, 2015, Huffman complained of left leg pain. (R. at 393.) Bailey Qualls, PA-C, a certified physician assistant, ordered an electromyogram, ("EMG"), of Huffman's lower extremities. (R. at 395), which showed findings consistent with a chronic lesion to the left S1 nerve root. (R. at 399-402.)

On February 16, 2015, Huffman had some numbness over the top of his right foot, as well as diminished Achilles reflexes bilaterally, but he demonstrated no significant axial lower back tenderness, and he could heel and toe walk without difficulty. (R. at 392.) Maupin diagnosed chronic left S1 radiculopathy causing some persistent symptoms in the left leg and an L4-L5 spondylolisthesis with bilateral lateral recess stenosis, right greater than left, causing some right leg pain. (R. at 392.) Maupin discussed treatment options with Huffman, including surgery, but he stated that the pain was not bad enough to consider surgical options. (R. at 392.) Maupin advised Huffman to wean off of the gabapentin and start on Lyrica three times daily for the radiculopathy. (R. at 392.)

On March 12, 2015, Huffman complained of back and knee pain. (R. at 583-86.) Huffman's physical examination remained normal, showing no joint swelling, normal movements of all extremities, intact sensation and reflexes and normal

motor strength. (R. at 586.) Despite these normal examination findings, Dr. Renfro opined that Huffman was not capable of maintaining gainful employment. (R. at 586.) On March 18, 2015, Huffman complained of right leg pain. (R. at 388.) Huffman reported good resolution of his left leg pain. (R. at 388.) He stated that Lyrica improved his symptoms and, overall, his symptoms were tolerable. (R. at 388.) Qualls reported that Huffman had 5/5 motor strength in the bilateral lower extremities; he had diminished Achilles reflexes bilaterally; and he had intact sensation with the exception of some numbness on the top of his right foot. (R. at 389.) In June 2015, Dr. Renfro reported that Huffman's physical examination remained normal, showing no joint swelling, normal movements of all extremities, intact sensation and reflexes and normal motor strength. (R. at 581.) Dr. Renfro noted that Huffman was taking morphine only a couple of times per week, and he refused surgery "till he could not do anything." (R. at 582.)

On January 23, 2016, Dr. Renfro completed a medical assessment, indicating that Huffman could lift and carry items weighing up to 15 pounds occasionally and five pounds frequently; he could stand and/or walk up to four hours in an eight-hour workday, and he could do so for up to 30 minutes without interruption; he could sit up to four hours in an eight-hour workday, and he could do so for up to 30 minutes without interruption; he could never climb, stoop, kneel, balance, crouch or crawl; he had a limited ability to reach and push/pull; and he was restricted from working around heights, moving machinery and vibration. (R. at 403-05.) Dr. Renfro opined that Huffman would be absent from work more than two days a month due to his impairments. (R. at 405.)

Huffman did not seek any further treatment until he returned to Dr. Renfro in April 2016, reporting that he used morphine once a week, and the higher dose of

Lyrica made him dizzy, so he had tapered down, and could not tell much difference. (R. at 459.) His physical examination was unchanged, and Dr. Renfro renewed his medications. (R. at 461-62.) In August and October 2016, Huffman continued to complain of back and knee pain, but he indicated that he no longer required Percocet and used morphine only one time a week.[7] (R. at 445, 452.) Huffman reported that he had a limited ability to stand. (R. at 445.) His physical examinations remained benign, showing no joint swelling, normal movement of all extremities, intact sensation and normal motor strength. (R. at 447-48, 454-55.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that

---

[7] Huffman reported that he would increase his morphine intake when he experienced "shooting pains;" however, he did not indicate how often he experienced this type of pain. (R. at 445, 452.)

the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp. 2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Huffman argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 5-6.) In particular, Huffman argues that the ALJ erred by failing to give controlling weight to the opinion of his treating physician, Dr. Renfro, and by giving controlling weight to the opinions of the state agency physicians. (Plaintiff's Brief at 5-6.) Huffman contends that the state agency physicians' assessments were "stale [and] outdated," as they were rendered in 2014. (Plaintiff's Brief at 5-6.)

The ALJ found that Huffman had the residual functional capacity to perform light work that allowed for occasional stooping, crawling, crouching, kneeling and climbing of ramps and stairs and that did not require him to climb ladders, ropes or

scaffolds or to work around vibration. (R. at 17.)

In making this residual functional capacity finding, the ALJ stated that he was giving "less weight" to Dr. Renfro's January 2016 opinion and giving "substantial weight" to the state agency consultants' medical assessments (R. at 25-26.) While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. § 404.1527(c) (2019). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 404.1527(c)(3) (2019).

The ALJ noted he was giving "less weight" to Dr. Renfro's March 2015 statement that Huffman was not capable of maintaining gainful employment and his January 2016 assessment indicating that Huffman had an inability to perform the exertional demands of sedentary work because they appeared "overstated considering [Huffman's] conservative treatment course after surgery, positive treatment response, and the objective medical evidence…." (R. at 26.) The ALJ noted that Dr. Renfro's opinion was inconsistent with Huffman's conservative treatment history following surgery. (R. at 26.) *See* 20 C.F.R. § 404.1527(c)(3), (4); *Hall v. Berryhill,* 2017 WL 4330356, at *6 (E.D. N.C. Sept. 29, 2017) ("an ALJ may discount an opinion where it is inconsistent with a conservative course of treatment"); *Tilley v. Colvin,* 2016 WL 775420, at *12 (D. Md. Feb. 29, 2016)

("'[i]t is entirely appropriate for an ALJ to consider a discrepancy between a treating physician's opinion and the provision of conservative treatment to address a condition.'") (quoting *Norris v. Comm'r, Soc. Sec.,* 2014 WL 2612367, at *4 (D. Md. June 9, 2014)).

After Huffman underwent back surgery in February 2014, his treatment consisted of pain medication and a TENS unit, which Huffman reported as being helpful in relieving his symptoms. (R. at 52-55.) Treatment notes also show that Huffman's back pain was improved with medication. In March 2015, Huffman indicated that his symptoms were improved on Lyrica, and they were tolerable overall. (R. at 388.) In June 2015, Huffman stated that his pain symptoms were substantially improved with medication. (R. at 386.) In April 2016, Huffman reported that he only had to use morphine once a week, (R. at 459), and in August and October 2016, he reported that he no longer required Percocet. (R. at 445, 452.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Although Huffman discussed more aggressive treatment options with his providers at the Brain & Spine Center, he reported that the pain was not severe enough to consider surgical options, and he refused any surgery recommendations until he could not do anything. (R. at 392, 582.)

As noted by the ALJ, Dr. Renfro's treatment notes consistently document that Huffman had no joint swelling; normal movements of all extremities; intact sensation; and normal motor strength. (R. at (R. at 337, 447-48, 454-55, 461-62, 581, 586, 590, 627, 631, 634, 648, 652.) Huffman's physical examination findings at the Brain & Spine Center also were inconsistent with Dr. Renfro's opinion. In January 2015, Maupin observed that Huffman had good lumbar range of motion;

full motor strength throughout with the exception of left knee flexion, which was slightly reduced to 4/5; and no difficulty heel or toe walking. (R. at 397.) Again, in January 2015, Qualls noted that Huffman had 5/5 motor strength in the lower extremities; intact sensation; and intact and symmetric patellar reflexes. (R. at 394.) In February 2015, Huffman demonstrated no significant axial lower back tenderness, and he could heel and toe walk without difficulty. (R. at 392.) In March 2015, Qualls again reported that Huffman had 5/5 motor strength in the lower extremities, and in June 2015, Huffman was neurologically intact with a nonantalgic gait. (R. at 387.)

In addition, following arthroscopic surgery on his right knee, Huffman reported that his knees were "doing better" and that his knee pain was "not as bad." (R. at 341, 348, 351, 353.) Treatment notes show that Huffman had no joint swelling; he had full motor strength throughout both lower extremities with no deficits;[8] he had intact sensation;[9] and he had a normal gait. (R. at 323, 337, 343, 348, 353, 367, 447-48, 454-55, 461, 581, 586, 590.)

The ALJ gave "substantial weight" to the state agency physicians' assessments, who opined that Huffman could perform a reduced range of light work. (R. at 25-26, 82-84, 91-92.) The ALJ noted that the state agency physicians' assessments were well-supported and consistent with the totality of the evidence. (R. at 26.) Under the regulations, the ALJ was entitled to rely on the state agency psychologists' and physicians' assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified

---

[8] In January 2015, it was noted that Huffman's left knee motor strength was graded at 4/5. (R. at 397.)

[9] In March 2015, Huffman had some numbness on the top of his right foot. (R. at 389.)

and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Huffman argues that the ALJ should have given the state agency physicians' assessments less weight because they were "stale [and] outdated," because they did not have the benefit of reviewing the assessments of his treating physician, Dr. Renfro. (Plaintiff's Brief at 5-6.) The simple fact that those opinions came later in time than the state agency opinions does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

It is apparent from the ALJ's very thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence, and he ultimately found the state agency medical opinions were consistent with the

record as a whole. Given Huffman's surgical history and obesity, the ALJ limited Huffman to additional postural and environmental limitations not assessed by the state agency physicians. (R. at 26.) Based on this, I find that substantial evidence exists to support the ALJ's finding that Huffman had the residual functional capacity to perform a limited range of light work.

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding that Huffman had the residual functional capacity to perform a limited range of light work. Thus, I find that substantial evidence exists to support the ALJ's finding that Huffman was not disabled. An appropriate Order and Judgment will be entered.

DATED:	March 9, 2020.

                             /s/ *Pamela Meade Sargent*
                                    UNITED STATES MAGISTRATE JUDGE